## Duane v. Clark et al.

*White, Schnader, Maris & Clapp,* for plaintiff.
*Graham C. Woodward,* for defendants.

FINLETTER, P. J., April 11, 1934.—This is a taxpayer's bill brought to restrain the city commissioners from providing supplies and paraphernalia for the use of division assessors in making the annual assessment of voters. It is alleged

that the cost of these books and supplies would be a waste of public money, because the duty to make such assessments no longer exists, since the statute which requires them to be made in Philadelphia was repealed by the Act of January 17, 1934, P. L. 236.

The office of division assessor was created by the Act of January 30, 1874, P. L. 31. It provides, in section 1, that it shall be the duty of the assessor to make a house-to-house visitation of every dwelling house in his district, and make a list of "voters", with details of residence and other facts. Sections 2 and 3 provide for correction of the lists and the making of an additional return.

The Act of 1874 was amended on May 29, 1891, P. L. 134, on May 16, 1895, P. L. 75, and again on May 22, 1933, P. L. 908. These amendments are, however, not pertinent to the instant case.

On January 17, 1934, an act was approved, entitled: "An act to further amend sections one, two, three, ten, fifteen, eighteen and nineteen of the act, approved the thirtieth day of January, one thousand eight hundred and seventy-four . . . pursuant to Amendment Number Five to the Constitution . . . adopted November seventh, one thousand nine hundred thirty-three, eliminating the tax-paying qualification for voters."

· 1. Was a repeal of the sections named intended? We think there is no escape from the conclusion that there was. The language is: "Be it enacted, &c., That section one of the act [of 1874] . . . is hereby further amended to read as follows." This is a substitution of the new reading for the old. It can amount to nothing less than a repeal. While there is no express repeal, in the sense that the word "repeal" is not used, there is a distinct enactment that the act shall "read as follows." Whatever there is in the old section that is not repeated in the new one no longer exists as part of the act. The old act no longer "reads" as it did. The legislature has said it shall "read" otherwise, and states how.

The same language was used in connection with the other sections sought to be amended.

These sections of the Act of 1874 had previously been amended by the Acts of May 16, 1895, P. L. 75, and May 29, 1891, P. L. 134. In each, the amendment was made in the same form, i. e., by providing that the old section "shall read" as follows, etc.

2. What is the effect of the new reading? The new provision is: "That for the purpose of making the original annual registration of voters in each of the election districts in which personal registration of voters is not required . . . it shall be the duty of each of the assessors . . . in such election districts . . . to visit in person each and every dwelling house" and perform the other duties which were required under the Act of 1874.

A personal registration of voters is required by the Acts of July 10, 1919, P. L. 857, April 26, 1921, P. L. 292, and April 11, 1929, P. L. 483, in the City of Philadelphia.

The Act of January 17, 1934, therefore does not apply to the City of Philadelphia. And since the only statute that provides for division assessors and the making of division assessors' lists, the Act of 1874, has been repealed in this respect, the preparation of division assessors' lists in Philadelphia is no longer provided for.

3. It is urged that the assessment of the poll tax is seriously affected by the repeal of the assessors' lists.

Section 1 of article VIII of the Constitution of 1874 provided as a qualification for voting that a citizen shall, if 22 years of age or upwards, have paid within 2 years a State or county tax.

On November 7, 1933, the taxpaying qualification for voters was eliminated from the Constitution by Amendment No. 5 adopted on that day.

The history of the poll tax is this:

Under the Act of April 17, 1869, P. L. 49, sec. 41, it was the duty of councils to fix the amount of the county tax to be assessed personally and annually upon the qualified electors of the city. The act provided: "It shall be the duty of the council of the city of Philadelphia to fix the amount of county tax to be assessed personally and annually on the qualified electors of the said city, at a rate sufficient to provide for the payment of all election expenses in the said city". The tax thus imposed is that usually referred to as the poll tax. By the tax rate ordinance of December 12, 1868, councils fixed the rate for 1869 at 25 cents. The poll tax was not created by the Act of 1869, but it is said, in an opinion of the city solicitor (see Opinions 1915, page 58), to have existed for many years. It was continued annually, after 1868, by the provisions of the Act of March 4, 1862, P. L. 90. Its historical origin, however, is not important to the present discussion. It is sufficient to refer to its recognition in the Act of 1869, and its present existence.

More pertinent is the fact that payment of the poll tax was regarded as satisfying the constitutional requirement of payment of a county tax. Without it, many citizens would be deprived of the right of suffrage as the result of the former constitutional requirement of payment of a tax as a qualification to vote. Machinery was set up in the election codes for the assessment of this tax. Since it was payable by every individual, it was obvious that a list of all persons liable must be made. For this purpose the Act of January 30, 1874, P. L. 31, provided for the election of assessors in each election division and for the preparation of a list of persons liable to taxation (including the poll tax), by means of a house-to-house visitation by the assessors. The preparation of this list served two purposes. It was both an assessment of the poll tax on the persons listed and a registry of voters. (The latter use was eliminated by the Personal Registration Act.)

No doubt, as we have said, the motive for creating and imposing the poll tax was to extend the right of franchise, which was limited in the Constitution to taxpayers, by creating a tax by means of which citizens might qualify themselves to vote.

It was in these circumstances that Amendment No. 5 was passed, eliminating the payment of a tax as a qualification for voting. The poll tax was no longer needed as a voting qualification. Nor was "assessment" of the citizen longer needed for that purpose. So far as voting and elections are concerned, the poll tax was eliminated. It was still needed as a tax measure to pay the costs of elections, which was the expressed, although probably not the real, purpose of its creation. While the assessment of the tax no longer affected the right to vote, the duty of payment remained.

The Act of 1934, however, takes away the existing method of assessment, which was the inscription of the citizen's name upon the assessment list. Both the officer charged with the duty of assessment, and the assessment itself, no longer exist in Philadelphia.

4. In these circumstances it is urged that the title of the Act of 1934 is not only an insufficient compliance with article III of the Constitution, but that it is actually misleading, in that it leads the reader to infer that the only changes intended by the amendment were those needed to carry out the removal of tax payment as a qualification for voting, whereas in fact the assessment of the poll tax and the existence of the offices created, inter alia, to make the assessment, were wiped out of the amending act.

It must be conceded that there was no intention shown in the act to repeal the poll tax. It was a proper tax, intended, among other purposes, to pay the expenses of the election. Before the constitutional amendment was passed, it was a tax actually collected, because it had for sanction the giving of the right to vote. The constitutional amendment has taken away that sanction, and it is likely that nothing will be realized on the tax in the future, because it has no other practical sanction.

It is still due by each citizen. But it cannot now be assessed because the machinery for assessment is taken away by the Act of 1934. The constitutional amendment does not purport to interfere with the levying or assessment of the poll tax. Its sole purpose is to eliminate tax payments as a qualification for voting. It is argued that an act which expressly limits its purpose to "eliminating tax-paying qualifications for voters" would not concern itself with the assessment of taxes, and that the limitation of its professed purposes to the "tax-paying qualifications" was misleading.

But, on the other hand, the title expressly warns of an intention to amend specified sections of the Act of 1874. If it had stopped there, the title would have been sufficient, but it qualifies this by limiting itself to the purpose of fitting the old statute to the new amendment. The precedents which recognize a statement in the title of an act of a purpose to amend thus lose much of their force. But is a title which states a purpose to fit an existing statute to a specified constitutional amendment by amending named sections of an act not sufficient? Need the details and methods of the fitting be set forth? We think not. It is likely—and one reading the title is fairly warned by the statement—that changes are to be made, that the existing state of things will be interfered with and changed, not in general but in specified sections of the old act.

It is especially likely, with regard to such a subject as a tax that was imposed solely to extend the voting franchise by giving an opportunity to pay a tax, that radical changes in the assessment and collection of such tax would be made in an act passed for the expressed purpose of removing tax payment as a qualification for voting. The poll tax was undoubtedly created to permit a great number of citizens to qualify, by paying it, as voters. When such payment was eliminated as a voting qualification a change in its assessment would be most likely to be expected in the amending statute. The details and the method of adjusting the situation created by the constitutional amendment need not appear in the title. That some changes will be needed must be obvious to the reader of the title, and being thus warned it is to be expected that he will look at the body of the act. Specifically, if the title discloses that payment of a tax is eliminated by an act, it is quite likely that its assessment may be dealt with in an amending act.

5. It was suggested at the argument that the lack of an assessors' list would affect the system of drawing jurors in this county. It is quite proper that the effect of the statute should be considered, in connection with its interpretation. If absurd results would follow a given interpretation, it is unlikely that the legislature so intended. Likewise, if great confusion would result in existing systems with which the new act comes in contact. We have therefore examined carefully the effect of the repeal of the Act of 1874 upon the existing system for drawing jurors.

The statute on this subject is the Act of April 20, 1858, P. L. 354. It provides (sec. 2) that in "December in each and every year, the receiver of public taxes of the said city shall lodge with the said sheriff, for the use of the said [jury] board, a duly certified list of all the taxable inhabitants of the said city,"

and that the board shall "select from the said list of taxables a sufficient number of sober . . . citizens . . . for service" as jurors.

A supplement to the Act of 1858, approved April 13, 1859, P. L. 595, provided that "the several assessors of the city" shall ascertain the proper spelling, residence, and occupation of each taxable person in his *ward*, and "state . . . such particulars in his assessment list."

The officer referred to in this act was the "ward assessor" spoken of in the Act of April 17, 1869, P. L. 49, the Act of April 6, 1870, P. L. 53, and other acts, and not the division assessor. In 1859 there was no division assessor. The latter office was created by the Act of 1874. The Act of 1859 then became a dead letter with respect to the jury system.

The preparation then of the "list of taxables" for jury service remained as it was in the original act, that is, it remained the duty of the receiver of taxes to prepare that list and submit it to the jury board. Obviously a list of taxables must include all who are liable to the tax, whether it is paid or not, and also whether or not it is actually assessed.

It has been since 1874 the practice of the receiver of taxes to assume that the "assessors' lists", i. e., the lists prepared by the "division assessors", contained a complete list of taxables, and annually the receiver has transmitted the printed assessors' lists to the board as a compliance with the Act of 1858, a practice which we think was quite proper, because the assessors' list was as full a list of taxables as it was humanly possible to make.

He can no longer do this, since the Act of 1934 has legislated that list out of existence. Nor is there any substitute to which the receiver may resort. The list of citizens who have personally registered themselves as electors under the Personal Registration Act is not such a list, because it does not include all the "taxables." Nor does a list of those who have paid a real estate tax, or a four-mill or other tax on personal property, answer the requirement of a full list of taxables. It does not, for example, include all those who are liable to a poll tax, but who do not have taxable real estate or personal property. A list formed on this basis, even if those personally registered as electors are added, is not a complete list of taxables. The citizen liable to a poll tax has the right to serve as a juror. To choose jurors from a list which omits his name deprives him of that right. We see no escape for the receiver of taxes from making a house-to-house visitation as a basis of the "list of taxables" he is bound to furnish to the board of jury commissioners under the Act of 1858.

Nevertheless, this does not affect the question whether or not the Act of 1934 has done away with the division assessors' lists. If it has not, we may still utilize for jury purposes the old assessors' lists. If we are to have these lists no longer, the receiver of taxes must make his own lists.

6. We have also considered the effect of the repeal upon the personal registration system. There is no contact now between that system and the division assessors' list.

7. Nor, so far as a rather careful examination of the general election laws discloses, can we find that any confusion will result from the repeal.

8. We are of opinion, therefore:

(1) That the Act of 1934 repeals the sections of the Act of 1874 which provide for making a division assessor's list.

(2) That the system set up by the Act of 1934 does not apply to Philadelphia.

(3) That there is no existing statutory authority for making a division assessment list in Philadelphia.

(4) That the title of the Act of 1934 is a sufficient compliance with the constitutional requirement on that subject.

(5) That the city should not go to the expense of providing the books, stationery, and paraphernalia needed for the preparation of the lists.

(6) That an injunction restraining the official defendants from incurring or paying such expenses should issue.

(7) That under the stipulation of the parties a final decree in the sense of the above conclusions should be entered.